Trina Realmuto (CA SBN 201088)
Mary Kenney* (DC SBN 1044695)
Kristin Macleod-Ball* (NY SBN 5340500)
Aidan Langston* (NY SBN 6082648)
NATIONAL IMMIGRATION LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA, 02446
617-819-4447
trina@immigrationlitigation.org

Bardis Vakili (CA SBN 247783)
LAW OFFICE OF BARDIS VAKILI P.C.
P.O. Box 234160
Encinitas, CA 92023
619-483-3490
bardis@vakililegal.com

*Pro hac vice applications forthcoming

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.P.E., on her own behalf and on behalf of her minor child, E.E.B.P., E.C.M.U., on her own behalf and on behalf of her minor child, E.M.M., H.S.C.G., on her own behalf and on behalf of her minor child, B.Y.C.G., S.S.F., on her own behalf and on behalf of her minor child, A.L.T.J.P., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. **'24CV0312 AGS VET** <br><br> **COMPLAINT** |

# INTRODUCTION

1.      This case concerns the tortious treatment and expulsions of four noncitizen mothers, Plaintiffs E.P.E., E.C.M.U., H.S.C.G., and S.S.F. (collectively Plaintiff Mothers) with their one- and two-day-old U.S. citizen babies, Plaintiffs E.E.B.P., E.M.M., B.Y.C.G., and A.L.T.J.P. (collectively Infant Plaintiffs), to extremely dangerous and unhealthy conditions in Tijuana, Mexico, by agents of the U.S. Border Patrol. In each case, Border Patrol agents knew or should have known that the timing, manner, and fact of their expulsions placed Plaintiffs in grave danger. Moreover, Border Patrol agents expelled the four infants without regard to their U.S. citizenship and three of the Plaintiff Mothers without regard to their fear of persecution or torture in Mexico.

2.      Plaintiff Mothers—all of whom were still recovering from delivering the Infant Plaintiffs one or two days earlier—were expelled with little but the clothes on their backs and their babies in their arms. None of them had money or food, and three did not have a cell phone. None were from Tijuana, and thus they had no home to go to. All were in pain and had been prescribed medication by doctors at the San Diego hospitals where Infant Plaintiffs were born, but U.S. Border Patrol agents did not permit them to fill their prescriptions prior to their expulsions.

3.          Infant Plaintiffs are all U.S. citizens. Border Patrol agents knew three of the Plaintiff Mothers had family members in the United States—including U.S. citizens—willing to care for Infant Plaintiffs and with whom Plaintiff Mothers wished the infants to stay. As a direct consequence of their expulsions, Plaintiff Mothers had difficulty providing basic necessities for their children, as well as for themselves, during the 375, 106, 256, and 220 days, respectively, that they struggled to survive in Mexico.

4.          U.S. Border Patrol agents carried out each expulsion under the purported authority of an interim final rule issued by the Centers for Disease Control and Prevention (CDC) under 42 U.S.C. § 265. However, the expulsions of Plaintiffs directly violated the rule and implementing guidance, which prohibited its application to U.S. citizens like Infant Plaintiffs, and to noncitizens who fear persecution or torture in the country of expulsion like Plaintiff Mothers. In addition, the stated justification for the expulsion authority—prevention of the introduction of COVID-19 into the United States—was not at issue, as Plaintiffs E.C.M.U., H.S.C.G., and S.S.F. had tested negative for COVID-19 while in the hospital, and Plaintiff E.P.E. had, at minimum, been thoroughly evaluated by hospital medical staff and discharged without mention of COVID-19 concerns.

5.          Plaintiffs bring this suit under the Federal Tort Claims Act (FTCA)

3

to seek compensation for the harm and losses they suffered as the result of the

tortious conduct committed by U.S Border Patrol agents.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this

Complaint under 28 U.S.C. § 1346(b).

7.      All Plaintiffs submitted timely administrative claims under the

FTCA to the U.S. Department of Homeland Security (DHS) and its component

agency U.S. Customs and Border Protection (CBP), of which U.S. Border

Patrol is a sub-component agency. CBP denied the administrative claims of all

Plaintiffs on August 22, 2023. Plaintiffs are timely filing this Complaint in

accord with the FTCA. 28 U.S.C. §§ 2675(a), 2401(b).

8.      Venue is proper in this District under 28 U.S.C. § 1402(b) as the

acts and omissions detailed in this Complaint occurred in this District.

## PARTIES

9.      Plaintiff E.P.E.,[1] a Mexican national, is currently 49 years old and

was 45 years old at the time that U.S. Border Patrol agents expelled her to

Mexico. She is the mother of Plaintiff E.E.B.P. She resides in Modesto,

California.

---

[1]      A motion to proceed under pseudonym accompanies the docketing of this
Complaint.

10.     Plaintiff E.E.B.P., a U.S. citizen, is currently three years old and was a two-day-old newborn at the time that U.S. Border Patrol agents expelled her to Mexico. She is the daughter of Plaintiff E.P.E. She resides with her mother in Modesto, California.

11.     Plaintiff E.C.M.U., a Honduran national, is currently 32 years old and was 28 years old at the time that U.S. Border Patrol agents expelled her to Mexico. She is the mother of Plaintiff E.M.M. She resides in Bronx, New York.

12.     Plaintiff E.M.M., a U.S. citizen, is currently three years old and was a one-day-old newborn at the time that U.S. Border Patrol agents expelled her to Mexico. She is the daughter of Plaintiff E.C.M.U. She resides with her mother in Bronx, New York.

13.     Plaintiff H.S.C.G., a Honduran national, is currently 31 years old and was 27 years old at the time that U.S. Border Patrol agents expelled her to Mexico. She is the mother of Plaintiff B.Y.C.G. She resides in Goodview, Minnesota.

14.     Plaintiff B.Y.C.G., a U.S. citizen, is currently three years old and was a two-day-old newborn at the time U.S. Border Patrol agents expelled him to Mexico. He is the son of Plaintiff H.S.C.G. He resides with his mother in Goodview, Minnesota.

15.     Plaintiff S.S.F., a Haitian national, is currently 26 years old and

was 23 years old at the time that U.S. Border Patrol agents expelled her to Mexico. She is the mother of A.L.T.J.P. She resides in Boston, Massachusetts.

16.    Plaintiff A.L.T.J.P., a U.S. citizen, is currently three years old and was a two-day-old newborn at the time U.S. Border Patrol agents expelled her to Mexico. She is the daughter of Plaintiff S.S.F. She resides with her mother in Boston, Massachusetts.

17.    Defendant United States of America is the appropriate defendant under the FTCA. 28 U.S.C. §§ 1346(b), 2671 *et seq*.

18.    All federal officers referenced in this Complaint were acting within the scope and course of their employment and were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

## LEGAL BACKGROUND

### *The Title 42 Expulsion Process*

19.    In a public health emergency, Congress authorized the Executive Branch to "prohibit, in whole or in part, the introduction of persons and property" from countries which it designates. 42 U.S.C. § 265.

*The 2020 Title 42 Regulations and Expulsion Orders*

20.    On March 24, 2020, in response to the pandemic caused by coronavirus disease 2019 (COVID-19), the U.S. Department of Health and Human Services (HHS) issued an interim final rule under 42 U.S.C. § 265

permitting the CDC to suspend the introduction of persons into the United

States who may "present a risk of transmission of a communicable disease."[2]

21.    Pursuant to the rule, the CDC issued the first of several orders

providing the DHS with the authority to "suspend the introduction" of

noncitizens seeking to enter the United States at and between land ports of

entry.[3] The Title 42 Order, effective March 20, 2020, applied to noncitizens

without proper travel documents, those whose entry is otherwise contrary to

law, and those who are apprehended near the border seeking to unlawfully enter

the United States.[4] With certain exemptions, it permitted DHS officers to return

such individuals to, inter alia, their countries of origin or the countries from

which they entered the United States.[5]

22.    Critically, the Title 42 Order did not apply to U.S. citizens, lawful

permanent residents, members of the armed forces, spouses and children of all

---

[2]    CDC and HHS, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559, 16,566, 2020 WL 1330968 (Mar. 24, 2020) (to be codified at 42 C.F.R. § 71.40).

[3]    CDC and HHS, Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060, 17,061, 2020 WL 1445906 (Mar. 26, 2020) [hereinafter Title 42 Order].

[4]    *Id.*

[5]    *Id.* at 17,067.

three of those groups, or noncitizens with valid travel documents.[6] Additionally, it exempted "persons whom customs officers of DHS determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."[7]

23.     CDC extended and amended the Title 42 Order in April and May, 2020.[8] It subsequently published a Final Rule on September 11, 2020,[9] and, with amendments not relevant here, again extended the Title 42 Order on October 16, 2020.[10] All extensions of the Title 42 Order contained the same exemptions.

24.     The primary stated rationales for the Title 42 Order and subsequent extensions were that the individuals subject to them generally were held for extended periods in CBP facilities while being processed, that these

---

[6]     *Id*. at 17,061.
[7]     *Id.*
[8]     *See* CDC and HHS, Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424, 2020 WL 1923282 (Apr. 22, 2020); CDC and HHS, Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503, 2020 WL 2619696 (May 26, 2020).
[9]     42 C.F.R. § 71.40 (2020).
[10]    *See* CDC and HHS, Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806, 2020 WL 6081986 (Oct. 16, 2020). Amendments after 2020 are not relevant to this claim.

facilities could not accommodate recommended social distancing, and that CBP was not equipped to handle COVID-19 testing of all detained individuals or segregation of those suspected of having the virus.[11]

25.    A federal court subsequently ruled that the Title 42 Order was arbitrary and capricious under the Administrative Procedure Act for, inter alia, failing to sufficiently consider that noncitizens may face persecution or torture in the country of expulsion. *Huisha-Huisha v. Mayorkas,* 642 F. Supp. 3d 1 (D.D.C. 2022), *cert. and stay granted sub nom. Arizona v. Mayorkas*, 143 S. Ct. 478 (2022), *and vacated as moot*, No. 22-5325, 2023 WL 5921335 (D.C. Cir. Sept. 7, 2023); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 731-32 (D.C. Cir. 2022) (holding that plaintiffs were likely to succeed on claim that government could not expel noncitizens under Title 42 to a country in which they would be persecuted or tortured).

*CBP's Implementation of the Title 42 Order*

26.    In March 2020, CBP implemented the Title 42 Order, and U.S. Border Patrol issued guidance to the field instructing its agents to apply the Title 42 Order to noncitizens seeking to enter the United States from Mexico or Canada at or between ports of entry who are without proper travel authorization

---

[11]    *See, e.g.*, Title 42 Order, *supra* n.3, 85 Fed Reg. at 17,066.

or subject to travel restrictions.[12] The guidance further instructed that injured noncitizens could not be expelled under Title 42 but instead were to be processed in accord with existing immigration laws under Title 8 of the United States Code.[13] Additionally, the guidance instructs that, where a noncitizen is subject to expulsion, the agent is *not* to take the person's property.[14]

27.     Further, the guidance instructed that, where a noncitizen states a reasonably believable claim of torture in the country to which they are being expelled, the agent cannot expel without first referring them to an asylum officer with U.S. Citizenship and Immigration Services (USCIS) for screening of their fear claim.[15] Subsequently, following decisions in the *Huisha-Huisha v. Mayorkas* litigation, CBP guidance instructed agents that noncitizens who manifest a fear of return to the country to which they are being expelled under Title 42 must either be exempted from Title 42 and placed in removal proceedings under 8 U.S.C. § 1229a or referred to an asylum officer within USCIS.[16] The guidance further provided examples of manifestations of fear,

---

[12]     U.S. Customs & Border Prot., *COVID-19 CAPIO* at 1, https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/COVID%2019%20Capio.pdf (last visited Feb. 11, 2024).
[13]     *Id.* at 3.
[14]     *Id.* at 2.
[15]     *Id.* at 4.
[16]     U.S. Customs & Border Prot., *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* at 2 (May 21, 2022), https://www.aila.org/library/cbp-issues-guidance-on-processing-of-noncitizens.

including an individual's statement that they are afraid of being sent to the country to which they are being expelled or a statement that they were previously or would be harmed in that country.[17]

28.    CBP has a longstanding policy of ensuring that pregnant women and family units are treated as "at-risk" populations of special concern due to their particular vulnerability.[18] In 2021 and 2022, CBP issued several memoranda memorializing the duty of care owed to these populations under this longstanding policy, including with respect to implementation of the Title 42 Order.

29.    For example, CBP instructed agents that "the treatment of women who give birth in CBP custody raises significant humanitarian and public health interests," which require an agent's "serious consideration" of whether an exception to the Title 42 Order is warranted, and further explained that:

> Women who have given birth in CBP custody may require additional medical care such that expulsion of the mother may lead to negative health outcomes for the mother and/or her newborn child. Additionally, these women could be expelled at locations or into conditions that make it difficult to safely care for the newborn child and recover from the delivery.[19]

---

[17]    *Id.* at 1-2.

[18]    U.S. Customs & Border Prot., *National Standards on Transport. Escort, Detention, and Search* § 5.1 (Oct. 2015) [hereinafter *TEDS Standards*], https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

[19]    Acting Comm'r Troy A. Miller, U.S. Customs & Border Prot.,

*CBP Policies Regarding Pregnant and Postpartum Mothers and Babies*

30.     CBP guidance instructs agents that, following the hospital discharge of a noncitizen in CBP custody, Border Patrol agents must follow all immediate discharge instructions while the person remains in custody.[20] Border Patrol agents are required to follow all hospital discharge instructions while the person remains in their custody, [21] which would include obtaining prescription medicine. Moreover, Border Patrol agents are required to ensure that a postpartum mother receives all hospital discharge papers in CBP's possession upon release from custody.[22]

31.     On information and belief, U.S. Border Patrol has a long-standing policy requiring its agents to provide information to noncitizen parents of U.S. citizen newborns about how to obtain U.S. birth certificates for their child. The

---

*Pregnancy and Childbirth Guidance* 1 (Aug. 18, 2021), https://cbpabusestest2.files.wordpress.com/2021/08/2021-08-18-dhs-cbp-pregnancy-childbirth-guidance.pdf.

[20]     U.S. Customs & Border Prot., *Children Born in the United States in CBP Custody or at a CBP Facility* § 6.1.7.4 (May 24, 2022) [hereinafter *Children Born in CBP Custody*], https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/2022_0524_children-born-in-cbp-custody-or-cbp-facilities-directive.pdf; *see also* U.S. Customs & Border Prot., *Policy Statement and Required Actions Regarding Pregnant, Postpartum, Nursing Individuals, and Infants in Custody* 3 (Nov. 23, 2021), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/2022-Policy%20Statement-%20and-Required-Action-Pregnant-Postpartum-Nursing-Individuals-and-Infants-%20%28signed%29_0.pdf.

[21]     *Children Born in CBP Custody*, *supra* n.20, § 6.1.7.4.

[22]     *Id.*

12

policy was memorialized in a memo instructing Border Patrol agents to provide each parent of a U.S. citizen newborn leaving its custody with a "Vital Records Information Tear Sheet" containing the hospital name and contact information for the appropriate state vital records department to help the parent obtain a birth certificate for the child. The Vital Records Information Tear Sheet must be provided in the noncitizen's primary language or must be read to the individual in her primary language by CBP personnel or a contract interpreter.[23]

## STATEMENT OF FACTS

### *E.P.E. and Infant E.E.B.P.'s Expulsion and Consequent Suffering in Mexico for 375 Days*

32.    On March 25, 2020, Ms. E.P.E., a then-45-year-old Mexican national who was approximately 37 weeks pregnant, entered the United States from Tijuana, Mexico, with her two five-year-old twin sons, who are both U.S. citizens. The family was fleeing persecution and threats in Mexico, and she intended to seek asylum in the United States.

33.    Approximately one week earlier, on or about March 18, 2020, Ms. E.P.E. fled her home state of Michoacán, Mexico, to Tijuana, Mexico, after her former partner—the father of her twin sons—was murdered. The drug cartel members who had been persecuting him had also tortured her and continued to

---

[23] *Id.* § 6.3.2.

stalk and threaten her and her twins.

34.     Upon arriving in Tijuana, Mexico, Ms. E.P.E. and her sons immediately went to the U.S. port of entry at San Ysidro, San Diego, California. There, she informed the CBP agents that her sons were U.S. citizens and that she was afraid to remain in Mexico due to threats against her and the children. The agents informed her that she could not enter the United States due to the COVID-19 pandemic and forced her to return to Mexico. Mexican authorities encountering people turned back from the port of entry then gave her a number, placing her on a waiting list of other asylum seekers, and told her that the wait would be between one and three years.

35.     About a week later, on or about March 25, 2020, Ms. E.P.E. went to a hospital in Tijuana with severe abdominal pains. She was bleeding and could no longer feel her unborn baby move; because she had suffered prior miscarriages, she feared that she was miscarrying again. Hospital personnel failed to admit her, citing limitations on admissions due to COVID-19. They also advised her that she would need a repeat cesarian section to deliver her baby.

36.     Ms. E.P.E. was panicked and in great pain. Later that day, believing she had no other options, Ms. E.P.E, with her two sons, entered the United States, in or near San Diego, California. By then she was very ill, in

pain, had blurred vision, and was experiencing momentary black-outs. Her mother had died in childbirth when she was young, and, fearing the same for herself, she was desperate to get medical assistance. With the help of her young sons, she walked until they encountered U.S. Border Patrol agents.

37.     The Border Patrol agents initially tried to send her back to Mexico, telling her that she should go to a hospital there. After she told them she had been turned away from a hospital in Mexico and continued pleading for help, they eventually called an ambulance.

38.     The ambulance transported Ms. E.P.E. and her sons to Scripps Mercy Hospital Chula Vista in Chula Vista, California. At the hospital, Border Patrol agents took her sons away but did not tell Ms. E.P.E. where they were being taken.

39.     Ms. E.P.E. was admitted to the hospital at 12:39 p.m. on March 25, 2020. She was diagnosed with preeclampsia with severe features, severe range blood pressure, and symptomatic headache, blurry vision, and epigastric pain. She was exhibiting pressured speech, appeared anxious, and was in emotional distress. She was thoroughly evaluated by hospital medical staff, who never expressed any indication in the medical records or to E.P.E. that she was or even could be positive for COVID-19.

40.     Plaintiff E.E.B.P. was delivered by cesarean section on March 26,

2020 at 9:28 a.m.

41.    Ms. E.P.E. remained in CBP custody throughout her entire hospital stay, with uniformed agents, who on information and belief were armed, standing guard at the door to her hospital room at all times.

42.    Soon after her surgery and while still recovering from anesthesia, a female Border Patrol agent came into Ms. E.P.E.'s room to take her fingerprints and have her sign documents. The agent, who spoke Spanish, did not explain what the documents were, but she told Ms. E.P.E. that she had to leave the country. The agent told Ms. E.P.E. that the president did not want "illegals" in the United States. When Ms. E.P.E. did not immediately sign the documents, the agent took her hand and forced her to sign them. Ms. E.P.E. was never given a copy of the documents that she was forced to sign and does not know what they were.

43.    Ms. E.P.E. showed one or more Border Patrol agents her sons' U.S. passports. She was extremely worried about them and asked the female agent—whose first name she believes was Evelyn—where they were. The agent refused to answer. Border Patrol agents never gave Ms. E.P.E. any information about where the boys were, who was taking care of them, how they were doing, or if she would be reunited with them. Only later did a hospital worker tell her that the boys were being taken care of by a family, but the worker was unable to

give further details.

44.    Ms. E.P.E. asked one of the agents if she could be released so that she and her children could go and stay with her sister, a United States citizen, in Oxnard, California. The agent did not respond to this question.

45.    On two or more occasions, Ms. E.P.E. told one or more Border Patrol agents about her fear of being returned to Mexico and about how she had been kidnapped and tortured there. On one such occasion, she even showed one or more agents the scar on her abdomen that she had received when drug cartel members kidnapped and assaulted her. Ms. E.P.E. did not receive a fear screening by USCIS prior to being expelled from the United States.

46.    Ms. E.P.E. was discharged from the hospital on March 28, 2020. Hospital records indicate the doctor prescribed Motrin 600 milligrams every six hours as needed for pain, as well as postnatal vitamins and Ferrous Sulfate, 325 milligrams twice a day, as an iron supplement.

47.    On the day of her discharge, the Border Patrol agents rushed Ms. E.P.E. and E.E.B.P. out of the hospital. It did not appear that hospital staff was given any warning she would be moved so suddenly. A hospital worker quickly gathered some baby items for her to take, including formula, diapers, a few baby clothes, and a blanket, and also gave Ms. E.P.E. maternity sanitary pads as she was bleeding heavily. The worker also returned her backpack to her and

gave her some paperwork.

48.     The female Border Patrol agent then made her walk out of her hospital room while carrying newborn E.E.B.P., the baby items, and her backpack. Seeing that Ms. E.P.E. was in intense pain and having difficulty walking and carrying everything, a nurse intervened, informing the agents in what appeared to be a heated discussion that Ms. E.P.E. should not be walking. A hospital worker then got her a wheelchair.

49.     Ms. E.P.E.'s twin sons were waiting for her with a Border Patrol agent outside the hospital. She was immensely relieved to see them. The agents ordered the family to get into a Border Patrol vehicle. Ms. E.P.E. told the agents that she was dizzy, in pain, and bleeding, and again asked if she and the children could stay with her sister in Oxnard, California, at least until she recovered. The agent told her no, saying that she was a danger to the community due to the ongoing COVID-19 pandemic.

50.     The Border Patrol agents did not take steps to fill Ms. E.P.E.'s prescription for pain medication prior to expelling her.

51.     A Border Patrol agent then drove the family to the San Ysidro port of entry on the border with Mexico and dropped them at the pedestrian crossing. Ms. E.P.E. was panicked and distraught, and again begged the agent to let her and the children go to her sister in Oxnard, California. The agent told

her that there would be someone on the Mexican side of the border to assist her, but there was no one there to help once they crossed.

52.     Border Patrol agents expelled Ms. E.P.E., E.E.B.P. and the twins to Mexico on March 28, 2020. The expulsion of two-day-old E.E.B.P. to Mexico was carried out against the will of her mother, Plaintiff E.P.E., who wanted her sister to be given temporary custody of E.E.B.P. and her sons—all three of whom were U.S. citizens. The Border Patrol agents never provided this option to Ms. E.P.E.

53.     At the time of her expulsion, the Border Patrol agents knew or should have known the significant health and safety risks facing Ms. E.P.E. and baby E.E.B.P. in Mexico.

54.     The Border Patrol agents expelled Ms. E.P.E. and her children with only the clothes they wore, the baby items and paperwork from the hospital, and the cell phone and identification documents Ms. E.P.E. had brought with her from Mexico. Ms. E.P.E. had neither money nor a birth certificate for E.E.B.P.

55.     The agents who expelled Ms. E.P.E., E.E.B.P., and the older children did not provide a reason for doing so or any documentary evidence of the expulsion. They also did not provide Ms. E.P.E. with any information about how she could obtain a birth certificate for E.E.B.P. Further, she was expelled to Mexico despite her claim of fear and past torture there and without being

given an opportunity to pursue a fear-based claim.

56.     The Border Patrol agents expelled Ms. E.P.E. and E.E.B.P. notwithstanding that E.E.B.P. was a U.S. citizen and that she could have lived in safety with her U.S. citizen aunt, as her mother wished.

57.     At the time of her expulsion, Ms. E.P.E. was in severe pain from her recent major surgery, felt dizzy, and was experiencing vaginal bleeding.

58.     In Tijuana, Ms. E.P.E. began walking, carrying E.E.B.P. and the baby items, and with her sons following. Blood ran down her leg. She became very dizzy and lightheaded and fell to the ground, hitting her head and dropping E.E.B.P., who also hit her head. The baby's eyes rolled back and Ms. E.P.E. was frantic, worried that E.E.B.P. was severely injured. Ms. E.P.E. lightly tapped E.E.B.P. on the cheek, which revived the baby.

59.     The twins were terrified by their mother's fall and were screaming and crying. One of them was so scared that he soiled himself. Ms. E.P.E. sat for a few minutes to regain her strength and calm down. Then she cleaned her son up as best she could and picked up the baby and her belongings. A mini-bus driver generously gave her a free ride to the shelter where she previously had stayed and a sandwich, which she gave to her sons.

60.     Ms. E.P.E. and E.E.B.P. were expelled from the United States for 375 days. While in Mexico, Ms. E.P.E. struggled to provide for E.E.B.P., the

older children, and herself. Because she was so anxious, upset, and afraid, Ms. E.P.E. was not able to produce enough milk to feed E.E.B.P. for some time in Mexico. She also did not always have money to buy formula. As a result, E.E.B.P. was often hungry. On one occasion, upon hearing the baby's cries, a neighbor purchased milk for her.

61.     Ms. E.P.E. depended on charities for food and shelter for approximately a month to six weeks. At that point, the hotel where she and other migrants were staying made everyone leave. Because she had nowhere else to go, Ms. E.P.E. returned to Michoacán with her children. There she went into hiding, depending on a friend for financial help and running up a large debt on an old credit card. She lived in constant fear that her persecutors would find her if she ventured out in public.

62.     In or about March 2021, an attorney with the nonprofit Al Otro Lado (AOL) submitted a parole request for Ms. E.P.E. and her two older children pursuant to a process created in connection with the litigation in *Huisha-Huisha v. Mayorkas*, No. 21-100 (EGS) (D.D.C. filed Jan. 12, 2021). On or about April 7, 2021, Ms. E.P.E. was paroled into the United States, and the two older children and E.E.B.P. entered with her. Ms. E.P.E. and E.E.B.P. spent 375 days in Mexico as a result of the U.S. Border Patrol's unlawful expulsion.

63.     On July 1, 2022, an immigration judge granted Ms. E.P.E. asylum. Ms. E.P.E. continues to fear that public disclosure of her identity would allow her persecutors to locate her in the United States.

***E.C.M.U. and Infant E.M.M.'s Expulsion and Consequent Suffering in Mexico for 106 Days***

64.     On the evening of December 8, 2020, Ms. E.C.M.U., a then-28-year-old Honduran national who was approximately 38 weeks pregnant, entered the United States from Tijuana, Mexico, with her two children, a nine-year-old son and a six-year-old daughter. The family was fleeing persecution and death threats in Honduras from members of two rival gangs. She intended to seek asylum in the United States.

65.     Ms. E.C.M.U.'s husband and the father of her children is a naturalized U.S. citizen who was living in the Bronx, New York. Prior to her fleeing Honduras, she and her husband had begun the process for her and the two children to immigrate to the United States.

66.     Upon fleeing from Honduras, Ms. E.C.M.U. and her two children arrived in Tijuana on or about September 8, 2020. In October 2020, Ms. E.C.M.U. visited the Comisión Mexicana de Ayuda a Refugiados (Mexican Commission for Refugee Assistance, COMAR) in Tijuana and asked to apply for asylum. Although Tijuana was very dangerous and she feared for the safety of her children while living there, she nevertheless hoped to gain legal status in

Mexico while she waited for her visa to the United States. Someone at COMAR told her that they would be in touch with her; however, no one ever contacted her.

67.     Her children were having health problems and because they were without legal status in Mexico, Ms. E.C.M.U. was unable to get adequate medical assistance for them. On December 8, 2020, after not hearing back from COMAR and increasingly concerned about the health and safety of her two children, Ms. E.C.M.U. and her children entered the United States in or near San Diego, California. Shortly after her entry, Ms. E.C.M.U. began to experience labor pains and her membranes ruptured (commonly referred to as her "water breaking"). Her children sought assistance from a U.S. Border Patrol agent who, in turn, called other Border Patrol agents. The latter agents arrived shortly thereafter at approximately 7:30 p.m.

68.     Upon encountering Ms. E.C.M.U., who was in clear distress from labor pains, a Border Patrol agent called an ambulance. Despite her obvious pain, one of the agents accused her, in Spanish, of breaking a bag of water on herself to feign that her water had broken and that she was going into labor. Ms. E.C.M.U.'s children were upset and pleaded with the agent to stop yelling at their mom.

69.     While waiting for the ambulance, the agents began processing

23

paperwork on Ms. E.C.M.U., asking for her name, the names of her children, and their relationship. She told them that her husband was a U.S. citizen living in New York, gave them his phone number, and asked that they contact him. She also attempted to tell them about her fear of return to Honduras and to Mexico, but the agents ordered her to answer only the questions asked.

70.     When the ambulance arrived, a Border Patrol agent ordered the paramedics to make sure that Ms. E.C.M.U. had not faked her water breaking before taking her to the hospital. Because of this, once she was on the gurney, the paramedics undressed her from the waist down to examine her—all in front of the male Border Patrol agents. The paramedics then covered her with a blanket and placed her in the ambulance. The Border Patrol agents placed her children in another vehicle, telling her only that they were taking the children to a facility for children. She told the agents that the children had their father's phone number and pleaded that the agents call him. One or more Border Patrol agents then followed the ambulance in another vehicle to the hospital.

71.     The ambulance took Ms. E.C.M.U. to Sharp Chula Vista Medical Center in Chula Vista, California, where she was admitted at 10:30 p.m. on December 8, 2020. Within the first few minutes after her admission, medical personnel administered a Covid-19 Molecular (Nucleic Acid Amplification) test on her, which was negative.

72.    After Ms. E.C.M.U. endured more than nine hours of labor, Plaintiff E.M.M. was born at 4:38 a.m. on December 9, 2020. Throughout the birth, two male Border Patrol agents, who were in uniform and, on information and belief, armed, were present in the delivery room. Having the agents in the room while she was giving birth was one of the most degrading and humiliating experiences of Ms. E.C.M.U.'s life.

73.    During the delivery, hospital staff gave Ms. E.C.M.U. oxytocin to improve contractions, and an epidural and fentanyl for pain. She suffered a second-degree perineal laceration, which required sutures. After delivery and throughout the remainder of her hospital stay, she was given ibuprofen 600 milligram (mg) tablets and two acetaminophen 650 mg tablets for pain on a regular basis. She also was provided topical treatments for perineal discomfort.

74.    Ms. E.C.M.U. remained in CBP custody throughout her entire hospital stay. Two male, uniformed Border Patrol agents were always present in Ms. E.C.M.U.'s hospital room, working on rotating shifts. None of them wore face masks. One or more agents made disparaging remarks to her in Spanish, including telling her that Honduran women were all trash, that all Hondurans came to the United States to steal, and that the agents' taxes were paying for her and others who were in the country illegally. When she responded that her husband paid taxes, one agent, a native Spanish speaker, said that her husband

was probably an illegal immigrant. The agent also said that "*mi papá*" (my daddy) then-President Trump would "do as he wanted" with "you illegal immigrants."

75.     One of the agents lied to her, saying that her older children were on a flight to their father and that she would never see them again. The agent also told her that she and E.M.M. would be deported to Mexico and that she would not get any papers showing the baby's birth in the United States. Ms. E.C.M.U. was so upset by the thought of never seeing her older children again that she began shaking and crying uncontrollably. In a threatening manner, the agent told her not to say anything to anyone else about what he had said. When a nurse entered the room and saw how upset Ms. E.C.M.U. was, she asked both the agents who were in the room to step outside the door. They refused to do this. Ms. E.C.M.U. was afraid to tell the nurse why she was so upset with the agents always in the room.

76.     A doctor also noticed Ms. E.C.M.U. crying and asked if it was due to the pain. Ms. E.C.M.U. told her no and that she was crying because she was distraught over the separation from her children. The doctor advised Ms. E.C.M.U. that when she got to New York City, she should see a postpartum psychologist.

77.     The Border Patrol agents similarly refused to step outside the room

when asked to do so by a social worker and refused to let a doctor pull the curtain around Ms. E.C.M.U.'s bed for privacy while the doctor examined her.

78.    Ms. E.C.M.U. had her phone with her in the hospital. She secretly texted her husband on the few occasions when she could do so without the agents noticing, letting him know where she was and asking if the children had been in touch. When he said he had heard nothing about the children, she again became frantic with worry about their wellbeing.

79.    Subsequently, Ms. E.C.M.U., in desperation, asked a hospital social worker to find out where her older children were; she also tried telling the social worker about her fear of returning to either Mexico or Honduras. One of the Border Patrol agents interrupted this conversation, stood over her bed in a threatening manner, and demanded to know what she was telling the social worker. Ms. E.C.M.U. was so frightened and intimidated by the agent's demeanor that she stopped talking to the social worker. She never learned of the whereabouts or safety of her older children while she was in the hospital, and, during this entire time, remained extremely afraid that she would not see them again, as the agent had threatened.

80.    A doctor or medical professional, who had witnessed the Border Patrol agents' behavior, privately gave her the hospital record of E.M.M.'s birth. Afraid that the agents would take this from her based on their threats that

27

they would never let her have papers proving E.M.M.'s birth, Ms. E.C.M.U. hid it under her hospital gown, and later in her clothes.

81.     The hospital discharged Ms. E.C.M.U. and one-day-old E.M.M. to U.S. Border Patrol custody mid-afternoon on December 10, 2020. Hospital staff instructed Ms. E.C.M.U. to refrain from heavy lifting and to schedule a follow-up appointment in 1 to 2 weeks. She was given a prescription for Motrin for pain, Ferrous Sulfate for anemia, and Colace, a stool softener.

82.     Upon her discharge, a different Border Patrol agent put Ms. E.C.M.U. and E.M.M. in a secure vehicle. He stopped at a pharmacy to try to fill her prescriptions, but the pharmacy did not have the medications. The agent did not go to another pharmacy and did not return the prescriptions to Ms. E.C.M.U., and thus she was never able to fill them.

83.     The agent next took her to a facility where her older children were held. When the older children entered the secure vehicle, Ms. E.C.M.U. was relieved to see them. The agent had lied, saying that he was taking them to meet her husband, and for a moment, they all were hopeful their nightmare might be ending. Instead, however, he drove the family to the El Chaparral port of entry, the southbound portion of the San Ysidro port of entry, between San Diego, California and Tijuana, Mexico.

84.     When they arrived at the port of entry, the agents instructed Ms.

28

E.C.M.U. to take the children through the pedestrian entry to Mexico. She was shocked and extremely upset when she realized that the agents were forcing her and her children to enter Mexico. She was panicked at the thought of being in Mexico without support, money, or food, with a newborn infant—for whom she did not have a birth certificate—and two young children. By this time, it was early evening and dark outside. She knew that Tijuana was dangerous at night. Moreover, all she and her children had were the clothes that they were wearing and a few baby items that the hospital had given Ms. E.C.M.U. It was chilly outside and the clothes the children had been given upon their release were not sufficient to keep them warm. Ms. E.C.M.U. began crying and begging the agents not to send them to Mexico.

85.     Border Patrol agents expelled the family to Mexico on December 10, 2020. The expulsion of E.M.M. to Mexico was carried out against the will of her mother, Plaintiff E.C.M.U. Ms. E.C.M.U. wanted E.M.M. to stay with her U.S. citizen husband, E.M.M.'s father, even if the agents expelled her to Mexico. However, the agents never gave her this option and, in fact, never contacted her husband despite her numerous requests.

86.     At the time of her expulsion, the Border Patrol agents knew or should have known the significant health and safety risks facing Ms. E.C.M.U. and baby E.M.M. in Mexico.

29

87.     The agents who expelled Ms. E.C.M.U., E.M.M., and the older children did not provide her with a reason for doing so or any documentary evidence of the expulsion. They also did not provide her with any information about how she could obtain a birth certificate for E.M.M. Further, she was expelled without being given any opportunity to pursue a fear-based claim regarding a return to either Mexico or Honduras. Finally, the agents who expelled her did not provide the hospital paperwork and prescriptions to her.

88.     The Border Patrol agents expelled Ms. E.C.M.U. and E.M.M. notwithstanding that E.M.M. was a U.S. citizen and that Ms. E.C.M.U. had tested negative for COVID-19. Moreover, the expulsion of infant E.M.M. occurred even though she could have lived with her father, a U.S. citizen living in New York.

89.     At the time of her expulsion, Ms. E.C.M.U. was in severe pain from her recent delivery, her head ached, and she felt feverish.

90.     In Tijuana, carrying E.M.M. and with her other children in tow, Ms. E.C.M.U. begged for bus fare from strangers so that she could get to the home of a Honduran family she knew. She collected enough money for a bus to central Tijuana. There she had to beg for more money to get another bus. By the time the family arrived at the Honduran family's house, it was about 10:00 p.m. E.M.M. was extremely hungry by then, as Ms. E.C.M.U. had been unable to

produce enough milk to feed the baby. Ms. E.C.M.U. was finally able to feed her a small amount at about 11 p.m. that night.

91.    Ms. E.C.M.U. and E.M.M. were expelled from the United States for 106 days. While in Mexico, Ms. E.C.M.U. struggled to provide for E.M.M., the older children, and herself. Her husband sent money to help with rent and clothes for the children. However, it was not enough to also cover food, medicine, diapers, and the family's other basic needs. Ms. E.C.M.U. depended on charities for help with food and diapers.

92.    Ms. E.C.M.U. was in pain following E.M.M.'s birth but did not have the prescription from Sharp Chula Vista Medical Center for pain medication. During her time in Mexico, she also was so severely depressed by her circumstances that she stopped showering, ate very little, and cried regularly. However, she was unable to pay for medical or psychological help and could not otherwise get such services because she did not have a Mexican identity document.

93.    While in Mexico, E.M.M. developed an ear infection. Ms. E.C.M.U. tried twice to go to a clinic for care for E.M.M. but was turned away both times because she had neither a U.S. birth certificate nor a Mexican identity document for the baby.

94.    On March 25, 2021, an attorney with the nonprofit AOL submitted

a parole request for Ms. E.C.M.U. and her two older children pursuant to a process created in connection with the litigation in *Huisha-Huisha v. Mayorkas*, No. 21-100 (EGS) (D.D.C. filed Jan. 12, 2021). On March 26, 2021, Ms. E.C.M.U. and the two older children were paroled into the United States, and E.M.M. entered with them, where they joined Ms. E.C.M.U.'s husband. In total, Ms. E.C.M.U. and E.M.M. spent 106 days in Mexico as a result of the U.S. Border Patrol's unlawful expulsion.

95.    Ms. E.C.M.U. continues to pursue legal permanent residency in the United States through her husband. She remains fearful that public disclosure of her identity would allow her persecutors to locate her in the United States.

### H.S.C.G. and Infant B.Y.C.G.'s Expulsion and Consequent Suffering in Mexico for 256 Days

96.    On July 10, 2020, Ms. H.S.C.G., a then-27-year-old Honduran national who was approximately 9 months pregnant, entered the United States from Tijuana, Mexico, with her 9-year-old son.

97.    Approximately a year and a half earlier, Ms. H.S.C.G., her partner, now husband, and her son fled persecution and death threats in Honduras to Mexico, where they believed that they would be safe. They applied for and were granted permission to remain in Mexico. Subsequently, they were warned by a family member in Honduras that they were not safe as their persecutors knew their location and were continuing to threaten them. Fearful of remaining

32

in Mexico, Ms. H.S.C.G. and her son fled to the United States, intending to seek asylum.

98.    After entering the United States on July 10, 2020, Ms. H.S.C.G. began to experience contractions and severe pain. She located uniformed and armed Border Patrol agents who were carrying what looked like batons and wore face masks. She told them she was in great pain and needed medical attention, but they did not seem to care. Instead, they began questioning her and took her fingerprints and photograph. Approximately a half hour after Ms. H.S.C.G. first encountered the agents, they ordered her and her son into a vehicle. By this time Ms. H.S.C.G. was in too much pain to climb into it. Only after seeing that she could not climb into the vehicle did the agents call an ambulance. An agent then gave the backpack she was carrying with a few clothes to her son and took him away in the Border Patrol vehicle. The agents did not tell Ms. H.S.C.G. where they were taking him, which caused H.S.C.G. great emotional and mental distress in addition to the physical pain she was experiencing.

99.    The ambulance took Ms. H.S.C.G. to Scripps Mercy Hospital Chula Vista in Chula Vista, California, where she was admitted at 11:38 p.m. on July 10, 2020. A Border Patrol agent rode in the ambulance with her.

100.    Upon her arrival at the hospital, the staff administered a rapid

COVID-19 (Nucleic Acid Amplification) test to Ms. H.S.C.G. at 11:51 p.m., which was negative. At the time of her admission, Ms. H.S.C.G. reported having increasingly painful, regular contractions since the morning of July 10, a moderately stable headache, and right upper quadrant pain. At that point she was having contractions every 2 to 4 minutes and was found to have mild lower extremity edema. She was admitted for labor management.

101.    After at least 20 hours of labor, Plaintiff B.Y.C.G. was born at 6:56 a.m. on July 11, 2020. During the delivery, Ms. H.S.C.G. was given fentanyl intravenously for pain. She suffered a first-degree perineal laceration, which was repaired.

102.    Two male Border Patrol agents, in uniforms and armed, stood guard outside of Ms. H.S.C.G.'s room throughout the entire time that she was in the hospital.

103.    Ms. H.S.C.G. was extremely worried about the safety and wellbeing of her 9-year-old son. She repeatedly asked the agents about him, but they would say only that he was fine and refused to give her any more information. Eventually, the agents simply ignored her questions. This did not alleviate Ms. H.S.C.G.'s concern for her son's wellbeing and safety.

104.    On July 11, 2020, her first full day in the hospital, Ms. H.S.C.G. spoke with a hospital social worker about her fear of being deported to either

Honduras or Mexico. On information and belief, the social worker relayed this fear to one or more Border Patrol agents. The next day, July 12, the hospital social worker advised Ms. H.S.C.G. that she had spoken by phone with someone in charge at Border Patrol who informed the social worker that, upon Ms. H.S.C.G.'s discharge from the hospital, agents would not deport her because she had tested negative for COVID-19. The social worker also told her that the Border Patrol agent had said that the agents would take Ms. H.S.C.G. and her children to a shelter. Ms. H.S.C.G. was extremely relieved to hear this.

105.    On the third day of Ms. H.S.C.G.'s hospitalization, July 13, 2020, a hospital worker handed her an envelope. She saw that at the same time, the worker handed another envelope to the Border Patrol agents guarding her hospital room. Ms. H.S.C.G.'s envelope contained the negative result of her COVID-19 test as well as some other papers related to her hospitalization. Ms. H.S.C.G. did not know what was in the envelope handed to the agents but reasonably assumed that it had all the same papers as her envelope, including a copy of her negative COVID-19 test.

106.    The hospital discharged Ms. H.S.C.G. and B.Y.C.G. to the custody of Border Patrol agents on the afternoon of July 13, 2020. A hospital worker gave her a few items for baby B.Y.C.G. prior to her discharge. The hospital physician prescribed Motrin 600 milligrams to be taken for pain as needed,

Colace for constipation, and postnatal vitamins, as well as instructions to follow up in four to six weeks for post-partum care. On information and belief, this prescription, which was in Ms. H.S.C.G.'s envelope, also was in the envelope handed to the Border Patrol agents. However, the agents did not provide Ms. H.S.C.G. with an opportunity to fill the prescription prior to expelling her to Mexico.

107.     Ms. H.S.C.G.'s 9-year-old son was waiting for her with Border Patrol agents outside of the hospital. She was both relieved and overjoyed to see him. She later learned from him that he had been held in a jail-like setting, which saddened her.

108.     The agents ordered her to get into a Border Patrol vehicle with baby B.Y.C.G. and her other son. A hospital worker had told her to make sure that B.Y.C.G. was secured in a baby carrier when traveling in a vehicle. There was a baby carrier in the vehicle, and she started to secure B.Y.C.G. into it. A Border Patrol agent stopped her from doing so, however, yelling an order that she had to just hold B.Y.C.G. in her arms so that they could get going.

109.     The Border Patrol agents did not tell her where they were taking the family. Based on what the social worker had told her, Ms. H.S.C.G. believed that the agents were taking them to a shelter in the United States. Consequently, she did not ask the agents where they were going.

110.      Rather than a shelter, the Border Patrol agents took the family to a port of entry on the United States-Mexico border between San Diego and Tijuana—on information and belief, the San Ysidro port of entry—and ordered them to go through the pedestrian entry to Mexico. The agents told Ms. H.S.C.G. that there was someone waiting for them on the other side of the gate. She did not realize that this was a border crossing and, still thinking that she was going to a shelter, assumed that the person waiting for her would be from the shelter.

111.      Ms. H.S.C.G. was extremely weak, tired, and in terrible pain at this point. However, she walked towards the gate carrying B.Y.C.G. and the items given her by the hospital, with her other son walking with her, carrying the backpack they had when they entered the United States. While walking to the gate, she saw that an agent was filming them on his cell phone.

112.      After she passed through the gate, she saw the badges on the Mexican officials standing there. Only then did she realize that she, B.Y.C.G. and her other son were being expelled to Mexico. She was extremely distressed when she realized this. She had no money, no phone, and only the few baby items and paperwork given to her by the hospital and the backpack with a few clothes.

113.      The expulsion of baby B.Y.C.G. was carried out against the will

37

of his mother, Plaintiff H.S.C.G.

114.     At the time of her expulsion, the Border Patrol agents knew or should have known the significant health and safety risks facing Ms. H.S.C.G. and infant B.Y.C.G. in Mexico.

115.     The agents who expelled Ms. H.S.C.G., B.Y.C.G., and her 9-year-old son did not provide her with a reason for doing so or any documentary evidence of the expulsion. They also did not provide her with any information about how she could obtain a birth certificate for B.Y.C.G. Consequently, the only proof of his birth that she had was a paper from the hospital.

116.     The Border Patrol agents knew or should have known that Ms. H.S.C.G. was afraid of being returned to Mexico yet they expelled her without giving her any opportunity to make a fear-based claim regarding return to Mexico. Further, by informing the social worker that Ms. H.S.C.G. would not be deported but instead sent to a shelter, and by never telling Ms. H.S.C.G. that they were expelling her, they misled her into thinking that it was not necessary to make a fear-based claim at that time.

117.     The Border Patrol agents expelled Ms. H.S.C.G. and B.Y.C.G. notwithstanding that B.Y.C.G. was a U.S. citizen and that Ms. H.S.C.G. had tested negative for COVID-19.

118.     During her expulsion, Ms. H.S.C.G. was questioned by Mexican

authorities who threatened to deport her and the children to Honduras. Only after she explained that her partner—B.Y.C.G.'s father—was in Tijuana did the Mexican authorities give her permission to remain in Mexico.

119.     Because she had no phone and no money, she had to borrow a cell phone from a stranger. With it, she was able to call her partner, who picked up her and her children. They spent the first few nights at the home of an acquaintance of her partner; however, they had little to eat and were extremely hungry.

120.     Ms. H.S.C.G. and B.Y.C.G. were expelled to Mexico for 256 days. Throughout this time, Ms. H.S.C.G. was often unable to provide even basic necessities for B.Y.C.G. and her 9-year-old son. She was forced to rely on charity for help with rent and utilities and often did not have money for food, including milk, bread, or other necessities.

121.     B.Y.C.G. was sick numerous times in Mexico. Ms. H.S.C.G. was unable to get him vaccinated in Mexico on the recommended vaccination schedule for infants because she did not have a birth certificate for him, and no medical clinic would provide the vaccinations without it. While in Mexico, he suffered from the flu, fevers, and a lung infection. Ms. H.S.C.G. was dependent on a nonprofit, Al Otro Lado, to take him to the hospital for check-ups on his lungs every two weeks.

122.    Ms. H.S.C.G. was in pain following B.Y.C.G.'s birth but did not realize the hospital had prescribed pain medication.

123.    On or about March 25, 2021, advocates submitted a parole request for Ms. H.S.C.G., her partner and her children pursuant to a process created in connection with the litigation in *Huisha-Huisha v. Mayorkas*, No. 21-100 (EGS), (D.D.C. filed Jan. 12, 2021). On March 26, 2021, Ms. H.S.C.G., her partner, and her 9-year-old son were paroled into the United States, and B.Y.C.G. entered with them. In total, H.S.C.G. and B.Y.C.G. spent 256 days in Mexico as a result of the U.S. Border Patrol's unlawful expulsion.

124.    Ms. H.S.C.G. is pursuing humanitarian relief from removal in the United States. She remains fearful that public disclosure of her identity would allow her persecutors to locate her in the United States.

### S.S.F. and Infant A.L.T.J.P.'s Expulsion and Consequent Suffering in Mexico for 220 Days

125.    On or about July 14, 2020, Ms. S.S.F., a then 23-year-old Haitian national who was close to nine months pregnant with her first child, entered the United States from Tijuana, Mexico. She was fleeing persecution and threats in Haiti and intended to seek asylum in the United States.

126.    Ms. S.S.F. first arrived in Mexico in mid-to-late 2019 and was detained by Mexican authorities. While in detention, Mexican officials assisted her with applying for immigration status, which was granted on January 20,

2020. On information and belief, Mexico had no diplomatic relations with Haiti at that time and classified detained Haitians, including Ms. S.S.F., as "stateless." It granted Ms. S.S.F. immigration status based upon this erroneous stateless designation.

127.     In July 2022, Ms. S.S.F., who was living in Tijuana, was in the late stages of pregnancy. On or about July 14, 2022, she began to experience abdominal pain and became concerned about her pregnancy. She went to a medical clinic for assistance, but clinic staff told her that they could not assist with pregnancy-related problems and referred her to a hospital. Ms. S.S.F. then went to the hospital but was turned away without assistance because she did not have insurance.

128.     With no experience of childbirth and no family in Tijuana, Ms. S.S.F. was extremely worried about giving birth without medical assistance. Believing she had no other option for obtaining medical assistance, Ms. S.S.F. entered the United States in or near San Diego, California in the early evening on July 14, 2020. She entered with a woman she did not know. Ms. S.S.F. and the woman soon located Border Patrol agents, who took the two women to a Border Patrol facility.

129.     At the facility, Border Patrol agents confiscated Ms. S.S.F.'s belongings—which included the phone number of her brother in Boston and

clothes for herself and the baby. The Border Patrol agents asked for Ms. S.S.F.'s identification and took her photograph and fingerprints. They then detained her in a cell. During the time she was detained, all she was given to eat and drink were cookies and juice.

130.    Throughout this time, Ms. S.S.F. was experiencing intermittent pain. A woman working at Border Patrol facility appeared to Ms. S.S.F. to be a medical worker. This woman told the agents that they needed to take Ms. S.S.F. and another woman to the hospital. Consequently, sometime in the early morning hours of July 15, agents transported Ms. S.S.F. and the other woman to Scripps Mercy Hospital Chula Vista in Chula Vista, California in a Border Patrol vehicle.

131.    The hospital admitted Ms. S.S.F. with a diagnosis of high-risk pregnancy, with a prolonged spontaneous rupture of the membranes and active labor. Soon after her admission, at 4:39 a.m., and again several hours later, at 8:58 a.m., the hospital tested Ms. S.S.F. for COVID-19; both tests were negative. Ms. S.S.F. informed a nurse that she wanted to join her brother in Boston after her baby was born. A social worker who checked on Ms. S.S.F. reported that she appeared nervous.

132.    One or more uniformed Border Patrol agents, who on information and belief were armed, stood guard at the door to Ms. S.S.F.'s hospital room

42

throughout her stay. On July 15, 2020, these agents informed a hospital social worker that they expected to take Ms. S.S.F. back to the Border Patrol facility for further processing after she was discharged. They also informed the social worker that Ms. S.S.F. had asked to use a phone to let her relatives know that she and the baby were fine, but that they prohibited her use of the phone. They did not allow the social worker to use a phone for purposes of engaging a Haitian Creole interpreter so that the social worker could speak with Ms. S.S.F.

133.     The following day, July 16, at 8:35 a.m., Ms. S.S.F. delivered baby A.L.T.J.P., more than 29 hours after her membranes first ruptured, and at least that long since her labor first began. The doctors performed an episiotomy on Ms. S.S.F. during the delivery and subsequently stitched up the incision.

134.     Later that day, the social worker met in person with Ms. S.S.F. and was able to arrange to have a Haitian Creole interpreter on the phone. Ms. S.S.F. was emotional and tearful at several points during the interview. Ms. S.S.F. informed the social worker that she had a brother in Boston with whom she and A.L.T.J.P. could stay. She did not remember his phone number but told the social worker it was written on a piece of paper with her belongings at the Border Patrol facility.

135.     On July 16, 2020, the social worker also spoke by phone with a Border Patrol agent named Mills, who she described as a medical supervisor.

Agent Mills asked for confirmation of Ms. S.S.F.'s COVID-19 test results, which the social worker provided. On July 17, 2020, the social worker again spoke with Agent Mills, providing him with Ms. S.S.F.'s brother's name, telling him that that the brother was in Boston and mistakenly indicating that the brother's phone number was on Ms. S.S.F.'s cell phone at the facility. In fact, Ms. S.S.F. did not have a cell phone but instead had her brother's number written on a piece of paper with her other belongings at the Border Patrol facility. Agent Mills indicated that he would try to locate the phone referenced by the social worker. He also indicated that he did not know whether Ms. S.S.F. would be permitted to remain in the United States.

136.    On July 18, 2020, Ms. S.S.F. and baby A.L.T.J.P. were discharged from the hospital into the custody of the U.S. Border Patrol. Ms. S.S.F.'s discharge diagnosis was acute on chronic anemia. She was prescribed the iron medication ferrous sulfate, 325 milligrams, three times per day. The hospital gave her a few bottles of milk and a few items of clothing for the baby. Ms. S.S.F. also was given a hospital document verifying A.L.T.J.P.'s birth in the hospital.

137.    Upon her discharge, Border Patrol agents took Ms. S.S.F. and A.L.T.J.P. to the Border Patrol facility where Ms. S.S.F. had been prior to her hospitalization. They ordered her to wait with the baby in the vehicle while one

of them went inside. She asked in Spanish to go inside to use the bathroom, but the agents refused to allow this, telling her that they would be at their destination very shortly. They did not tell her where they were taking her.

138.    When the agent returned to the vehicle, he had Ms. S.S.F.'s bag that she had brought with her into the United States. He placed it in the vehicle and the agents then drove Ms. S.S.F. and A.L.T.J.P. to the U.S.-Mexico border. The agents did not provide Ms. S.S.F. with an opportunity to fill her prescription prior to taking her to the border.

139.    When Ms. S.S.F. saw the sign for Mexico, she realized where the agents were taking her. She became extremely distraught, crying and begging them in Spanish not to send her to Mexico. She told them that she had a brother in the United States. She also told them that she had no family in Mexico and nowhere for her and two-day-old A.L.T.J.P. to live. She was so distraught that she told them she would rather die than be sent to Mexico.

140.    When Ms. S.S.F. continued pleading, an agent forcefully took A.L.T.J.P. from her arms, threatening to take the baby from her if she did not cooperate. Two agents then forcefully grabbed Ms. S.S.F. and dragged her to the gate, first by holding her by her arms and then by holding her legs. As a result of the agents dragging, Ms. S.S.F.'s scraped her legs on the ground causing marks. Once at the gate, the agent holding A.L.T.J.P. returned the baby

to her mother and then the agents ordered Ms. S.S.F. to leave the United States. She had no money, no phone, and only the belongings she had entered the United States with, and the few baby items and paperwork given to her by the hospital.

141.    The expulsion of baby A.L.T.J.P. was carried out against the will of her mother, Plaintiff S.S.F.

142.    At the time of her expulsion, the Border Patrol agents knew or should have known the significant health and safety risks facing Ms. S.S.F. and infant A.L.T.J.P. in Mexico.

143.    The agents who expelled Ms. S.S.F. and A.L.T.J.P. did not provide her with a reason for doing so or any documentary evidence of the expulsion. They also did not provide her with any information about how she could obtain a birth certificate for A.L.T.J.P. Consequently, the only proof of A.L.T.J.P.'s birth that she had was a paper from the hospital.

144.    The Border Patrol agents expelled Ms. S.S.F. and A.L.T.J.P. notwithstanding that A.L.T.J.P. was a U.S. citizen and that Ms. S.S.F. twice tested negative for COVID-19.

145.    Ms. S.S.F. was panicked about how she would cope in Mexico with a newborn infant. Because this was her first child, she had no experience with taking care of a newborn. She was at a loss as to what to do or where to go.

She was very afraid for her own and A.L.T.J.P.'s safety. She was still in pain from the recent childbirth and so anxious that she felt as if she could not breathe and that her head was exploding.

146.    Upon her expulsion to Mexico on the afternoon of July 18, 2020, all Ms. S.S.F. could manage was to sit by the side of a road, sobbing uncontrollably. Eventually, she was able to feed A.L.T.J.P. some of the milk provided by the hospital. Ms. S.S.F. was exhausted and finally dozed offed by the side of the road with A.L.T.J.P. in her arms.

147.    Ms. S.S.F. and A.L.T.J.P. spent the next three days living and sleeping on the streets of Tijuana, as they had nowhere else to go. Ms. S.S.F. used the remaining milk from the hospital to feed A.L.T.J.P. She also begged for money from strangers for food for herself and milk for A.L.T.J.P. While homeless on the streets, two men threatened Ms. S.S.F. and robbed her of the only belongings that she had—the few items of extra clothing for herself and A.L.T.J.P.

148.     On or about the third day following their expulsion, someone allowed her to use their phone and Ms. S.S.F. was able to get in touch with her brother. Her brother sent a friend in Tijuana to pick up Ms. S.F.F. and A.L.T.J.P. They were able to stay with her brother's friend for about a month.

149.    Someone then told Ms. S.S.F. about the non-governmental

organization AOL. Staff or volunteers at AOL found her a place to stay and paid her rent. With this help, she was able to remain at this location until she was paroled into the United States on February 23, 2021. AOL also assisted her by providing diapers, milk, and other necessities for A.L.T.J.P.

150.    Ms. S.S.F. was never able to obtain the iron pills prescribed by the hospital. The clinic in Mexico where she went was not able to give her these pills. Throughout her time in Mexico, she was tired and sometimes dizzy.

151.    In February 2021, advocates submitted a parole request for Ms. S.S.F. pursuant to the process created in connection with the litigation in *Huisha-Huisha v. Mayorkas*, No. 21-100 (EGS), (D.D.C. filed Jan. 12, 2021). On February 23, 2021, Ms. S.S.F. was paroled into the United States and A.L.T.J.P. entered with her. In total, Ms. S.S.F. and A.L.T.J.P. spent 220 days in Mexico as the result of the U.S. Border Patrol's unlawful expulsion.

152.    Ms. S.S.F. was granted Temporary Protected Status in the United States. She also is pursuing an asylum claim. She remains fearful that public disclosure of her identity would allow her persecutors to locate her in the United States.

**COUNT I**
**FALSE IMPRISONMENT**
**(Infant Plaintiffs E.E.B.P., E.M.M., B.Y.C.G., A.L.T.J.P.)**

153.    Plaintiffs repeat and reallege all the foregoing allegations as

though fully set forth herein.

154. Infant Plaintiffs E.E.B.P., E.M.M., B.Y.C.G., and A.L.T.J.P. are U.S. citizens by birth in the United States.

155. The Border Patrol agents referenced above unlawfully and intentionally confined Plaintiffs E.E.B.P, E.M.M., B.Y.C.G., and A.L.T.J.P. following their respective births and/or discharges from the hospital and continuing through their physical expulsion from the United States to Mexico and their extended periods of expulsion in Mexico.

156. The unlawful and intentional confinement and physical expulsion from the United States of Plaintiffs E.E.B.P., E.M.M., B.Y.C.G., and A.L.T.J.P. was carried out against the will of their mothers, Plaintiffs E.P.E., E.C.M.U., H.S.C.G., and S.S.F., respectively.

157. As U.S. citizens, Border Patrol agents lacked lawful authority to physically expel E.E.B.P., E.M.M., B.Y.C.G., and A.L.T.J.P. from the United States without their mothers' consent.

158. During the time E.E.B.P., E.M.M., B.Y.C.G., and A.L.T.J.P. spent in Mexico after their expulsions, they were confined to Mexico.

159. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs E.E.B.P., E.M.M., B.Y.C.G., and A.L.T.J.P. for false imprisonment.

**COUNT II**
**FALSE IMPRISONMENT**
**(Plaintiff Mothers E.P.E., E.C.M.U., H.S.C.G., S.S.F.)**

160.    Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

161.    The Border Patrol agents referenced above unlawfully and without their consent deprived Plaintiffs E.P.E., E.C.M.U., H.S.C.G., and S.S.F. of their liberty by physically expelling them from the United States to Mexico given that all were medically compromised at the time, all had a fear of physical injury, torture, or death if expelled to Mexico, and all tested negative for COVID-19 and/or did not have COVID-19.

162.    The deprivation of Plaintiffs E.P.E.'s, E.C.M.U.'s, H.S.C.G.'s, and S.S.F.'s liberty lasted 375, 106, 256, and 220 days, respectively.

163.    During the time Plaintiffs E.P.E., E.C.M.U., H.S.C.G., and S.S.F. spent in Mexico after their expulsion, they were confined to Mexico.

164.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs E.P.E., E.C.M.U., H.S.C.G., and S.S.F. for false imprisonment.

**COUNT III**
**NEGLIGENCE**
**Expulsion Without First Seeking USCIS'**
**Review of Fear Claims**
**(Plaintiff Mothers E.P.E, E.C.M.U., and H.S.C.G.)**

165.    Plaintiffs repeat and reallege all the foregoing allegations as

50

though fully set forth herein.

166.    Border Patrol agents were prohibited from expelling to Mexico under Title 42 any noncitizen who expressed a fear of persecution or torture in Mexico without first referring the noncitizen to USCIS for a fear screening. Thus, Border Patrol agents had a duty to make a referral to USCIS when a noncitizen raised a fear claim.

167.    Plaintiffs E.P.E., E.C.M.U., and H.S.C.G. each had a fear of persecution or torture if expelled to Mexico. The Border Patrol agents referenced above knew or should have known that Plaintiffs E.P.E., E.C.M.U., and H.S.C.G. each had a fear of persecution or torture in Mexico.

168.    Border Patrol agents expelled Plaintiffs E.P.E., E.C.M.U., and H.S.C.G. to Mexico without first referring any of them to USCIS for a fear screening.

169.    Border Patrol agents breached their duty to Plaintiffs E.P.E., E.C.M.U., and H.S.C.G. by failing to ensure that USCIS carried out a fear screening prior to expelling them to Mexico.

170.    As a direct and proximate result of the above conduct, Plaintiffs E.P.E., E.C.M.U., and H.S.C.G. suffered substantial damages.

171.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs E.P.E., E.C.M.U., and H.S.C.G. for negligence. imprisonment.

**COUNT IV**
**NEGLIGENCE**
**Expulsion to Locations or Into Conditions**
**Which Placed Plaintiffs' Health and Safety at Risk**
**(All Plaintiffs)**

172.     Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

173.     The Border Patrol agents referenced above had a duty of care to Plaintiffs, including but not limited to, acting with reasonable and ordinary care, so as not to cause harm or injury to the Plaintiffs.

174.     By engaging in the acts alleged herein, the Border Patrol agents referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

175.     The Border Patrol agents were aware that Plaintiffs were particularly vulnerable given their at-risk status. The Border Patrol agents knew or should have known the grave health and safety danger facing Plaintiffs as postpartum mothers and newborn U.S. citizen infants upon expulsion to Mexico only days after delivery, without basic necessities, and without any support. In expelling Plaintiffs to Mexico in these circumstances, the Border Patrol agents breached their duty of care.

176.     As a direct and proximate result of the referenced conduct, Plaintiffs suffered damages.

177.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

**COUNT V**
**NEGLIGENCE**
**Failure to Return Plaintiffs' Belongings,**
**Including Hospital Paperwork and Prescriptions**
**(Plaintiff Mother E.C.M.U.)**

178.     Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

179.     The Border Patrol agents referenced above had a duty of care to Plaintiffs, including but not limited to, to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

180.     By engaging in the acts alleged herein, the Border Patrol agents referenced above breached their duty of care owed to Plaintiff E.C.M.U.

181.     Border Patrol agents had no authority to take Plaintiff E.C.M.U.'s belongings from her, including all hospital paperwork and hospital prescriptions. Upon taking her belongings, Border Patrol agents had a duty to return all of her belongings—including the hospital paperwork and prescriptions—to her following release from U.S. Border Patrol custody.

182.     Border Patrol agents breached this duty when they failed to return all belongings to Plaintiff E.C.M.U., including by failing to return to her the hospital paperwork and hospital prescriptions.

53

183.     As a direct and proximate result of the referenced conduct, Plaintiff E.C.M.U. suffered substantial damages.

184.     Under the Federal Tort Claims Act, the United States is liable to Plaintiff E.C.M.U. for negligence.

**COUNT VI**
**NEGLIGENCE:**
**Failure to Secure Prescribed Medications**
**For Plaintiffs While in Border Patrol Custody**
**(Plaintiff Mothers E.P.E., E.C.M.U., H.S.C.G., and S.S.F.)**

185.     Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

186.     The Border Patrol agents referenced above had a duty to Plaintiffs, including but not limited to, to act with ordinary care and prudence so as not to cause harm or injury to the Plaintiffs.

187.     By engaging in the acts alleged herein, the Border Patrol agents referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs E.P.E., E.C.M.U., H.S.C.G., and S.S.F.

188.     Under, at minimum, the National Standards on Transport. Escort, Detention, and Search Standards, the Border Patrol agents had a duty to procure prescribed medication for Plaintiffs while they were in Border Patrol custody.

189.     Border Patrol agents breached this duty when they failed to procure medication prescribed by the hospital for Plaintiffs E.P.E., E.C.M.U.,

H.S.C.G., and S.S.F. in the United States and instead expelled them to Mexico without medication.

190.    As a direct and proximate result of the referenced conduct, Plaintiffs E.P.E., E.C.M.U., H.S.C.G., and S.S.F. suffered substantial damages.

191.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs E.P.E., E.C.M.U., H.S.C.G., and S.S.F. for negligence.

**COUNT VII**
**NEGLIGENCE:**
**Failure to Provide Plaintiffs with Information**
**About Obtaining a U.S. Birth Certificate**
**(All Plaintiffs)**

192.    Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

193.    The Border Patrol agents referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to the Plaintiffs.

194.    Border Patrol agents had a duty to provide Plaintiff Mothers, on their own behalf and on behalf of Plaintiff Infants, with information regarding how they could obtain a U.S. birth certificate for their newborn children.

195.    The Border Patrol agents referenced above breached this duty when they failed to provide Plaintiff Mothers with any information about how they could obtain U.S. birth certificates for their newborn children.

196.     As a direct and proximate result of the referenced conduct, all Plaintiffs suffered substantial damages.

197.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Plaintiffs)

198.     Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

199.     By engaging in the acts described in the Complaint, the Border Patrol agents referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer several emotional distress.

200.     As a direct and proximate result of the conduct, Plaintiffs suffered severe emotional distress.

201.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

## COUNT IX
## ASSAULT
### (Plaintiff S.S.F.)

202.     Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

203.     U.S. Border Patrol agents threatened Ms. S.S.F. prior to forcefully removing her from the Border Patrol vehicle, intending to cause harmful contact. Ms. S.S.F. reasonably feared that she was about to be touched in a harmful manner.

204.     Ms. S.S.F. did not consent to the Border Patrol agents' conduct.

205.     Ms. S.S.F. was harmed by the Border Patrol agents' conduct. The Border Patrol agents' conduct was a substantial factor in causing her emotional distress.

206.     Under the Federal Tort Claims Act, the United States is liable to Ms. S.S.F. for assault.

**COUNT X**
**BATTERY**
**(Plaintiff S.S.F.)**

207.     Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

208.     Border Patrol agents intended to cause harmful contact when they forcefully pulled Ms. S.S.F. from the Border Patrol vehicle and dragged her across the ground.

209.     Ms. S.S.F. did not consent to the Border Patrol agents' conduct in pulling her from the Border Patrol vehicle and dragging her across the ground.

210.     Ms. S.S.F. was harmed by the Border Patrol agents' conduct.

211. Under the Federal Tort Claims Act, the United States is liable to Ms. S.S.F. for battery.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

a. Trial by judge;

b. Entry of judgment for Plaintiffs and against Defendant on Plaintiffs' claims for relief;

c. Compensatory damages in an amount to be proven at trial;

d. Costs and reasonable attorneys' fees; and

e. Such other relief as the Court deems just and appropriate.

Respectfully submitted,

s/ *Trina Realmuto*
Trina Realmuto (CA SBN 201088)          Bardis Vakili (CA SBN 247783)
Mary Kenney* (DC SBN 1044695)           LAW OFFICE OF BARDIS VAKILI P.C.
Kristin Macleod-Ball* (NY SBN           P.O. Box 234160
5340500)                                Encinitas, CA 92023
Aidan Langston* (NY SBN 6082648)        619-483-3490
NATIONAL IMMIGRATION                    bardis@vakililegal.com
   LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA, 02446
617-819-4447
trina@immigrationlitigation.org
mary@immigrationlitigation.org
kristin@immigrationlitigation.org
aidan@immigrationlitigation.org

*Attorneys for Plaintiffs*

\* *Pro hac vice applications forthcoming*